Commonwealth *v.* Tomaski, Appellant.

Argued October 4, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Paul C. Van Dyke,* with him *James A. Cochrane,* for appellant.

*William H. Turner,* with him *C. William Kraft, Jr.,* District Attorney, for appellee.

OPINION BY DITHRICH, J., November 21, 1951:

Defendant stands convicted of assault and battery with intent to kill. He was also convicted on three other bills growing out of the same action but was sentenced only on indictment No. 223 November Sessions, 1950, in the Court of Quarter Sessions of Delaware County. It is from the judgment of sentence at No. 223 that he has appealed.

There were no eyewitnesses to the alleged offense, except the two principals. The prosecutor, Edwin (Ike) Eisenhower, testified that on Saturday, September 16, 1950, he had played a number with defendant which "hit", following which he and defendant had spent the evening together eating and drinking at Tinicum Inn, Essington, Delaware County, Pa. He said defendant told him he had hit for $450 and that he had spent freely of his winnings in treating defendant, who in turn treated him, and in setting up drinks for the house. Defendant was drinking straight whiskey; Eisenhower drank only beer.

When the Inn closed at midnight, the defendant told Eisenhower he would take him to the Polish-American Club, where he would be paid off by Big Jake Shanko. They got into Tomaski's automobile; but, instead of driving to the Club, he drove to an isolated spot along the river road in back of the Merchant Marine Base, where he stopped his car and "put" two guns on Eisenhower. In the ensuing struggle the prosecutor was struck over the mouth with one gun, resulting in a broken denture, and his right wrist was struck and broken with the other gun. He was forced out of the automo-

bile and pushed down an eight or ten foot embankment, after which defendant fired three shots at him. He managed, with the aid of his left hand—his right hand being useless because of the broken wrist—to pull himself back up the embankment. When he reached the top, his left hand came in contact with one of the guns. Carrying the gun in his left hand he walked two miles to the Club, where he found the defendant with Shanko. He demanded to know of defendant what he was trying to do, "trying to bump me off for a lousy $450? . . . A fellow grabbed hold of me and he said what are you doing. I said I don't know but he tried to kill me—take this gun." Both Tomaski and Shanko then ran out the back door of the Club. The prosecutor was placed in a cab and taken to the hospital, where his right wrist was placed in a splint.

The defense was a flat denial of the prosecutor's testimony, except that defendant admitted that Eisenhower had been in his car for a short time in the evening of Saturday, September 16. He denied, however, that he was taken in the car from the Tinicum Inn. He further denied that he had been there drinking with Eisenhower; and the Chief of Police of the Township testified, without objection, that in the course of his investigation of the alleged assault he was told by the proprietor of the Inn that neither of the men had been in his place that evening. Tomaski testified that, when he stopped his car in front of Small's Tavern on the Tinicum Road about six blocks from the Inn between 10:30 and 11:00 p.m., Eisenhower opened the door and got in the seat beside him. He was mumbling something —he couldn't understand what—and asked to be taken home. Defendant didn't know exactly where he lived but he drove near to where he thought he lived and there put him out of his car. Defendant then returned to Small's Tavern. John Polinski and his wife testified to meeting defendant at the Tavern between 11:00 and

11:30 and going to the Club with him and a waitress from the Tavern after the Tavern closed at 12 o'clock. The evidence is conflicting as to what took place at the Club, but we do not attach much significance to it. There was testimony, however, that Eisenhower threatened the defendant with the gun and that it had to be taken from him.

Eleven reasons were assigned in support of a motion for a new trial but reliance has been placed principally upon alleged errors in the charge of the court. The prosecutor testified that he had played a number with defendant that day and that defendant had attempted to kill him rather than pay him what he had won. That testimony was properly admitted as tending to establish a motive for the intent to kill and was offered and admitted for that purpose. In his charge the learned judge of the court below said, "The commonwealth says that this thing occurred out of the refusal of the defendant to pay off when there was a hit made by Eisenhower on the number 536." There was nothing wrong with that part of the charge, but later the court said, "The commonwealth says by its testimony that Eisenhower had been playing with this defendant at the rate of $6.00 a week, $1.00 a day on number 536; Eisenhower said he had been playing with this defendant for some time. . . ." Eisenhower did not so testify, nor did anyone else. The nearest approach to such testimony was when the defendant was asked on cross-examination if Eisenhower didn't give him "$6.00 every Monday to play a dollar each day on number 536?" Defendant answered, "He never did."

In opening to the jury the district attorney said that according to the "best of his recollection"—and we will accept his recollection of what he said—"the Commonwealth expected to prove by the testimony of the witness, Edwin Eisenhower, that he . . . had been playing numbers with the defendant for quite some time, that

he . . . had given the defendant six dollars each Monday to play one dollar each day on the number 536, that on the date in question, the number 536 had 'hit' and that he . . . was entitled to receive $450.00 from the defendant." Counsel for the defendant objected to the district attorney's saying that the prosecutor "had been playing numbers with the defendant for quite some time," since the defendant had not been indicted "for any numbers violation or for gambling." The objection was overruled and an exception noted.

Notwithstanding the objection, the court in its charge said, "The defendant says, although he has not worked since 1944 and that he lives with his father, *that he is not engaged in the numbers game."* (Emphasis added.) So far as the record discloses the only evidence that he was in "the numbers game" was Eisenhower's testimony that he had played a number with him that day, not that he had been playing numbers with him "for some time."

Defendant further complains that the court erred in charging that "if you find as a fact that this thing arose out of the refusal of this defendant to pay when Eisenhower hit, then the thing that I want you to understand is that what happened after this is *what usually happens in cases of this kind."* (Emphasis added.) Cf. *Commonwealth v. Stewart,* 158 Pa. Superior Ct. 424, 44 A. 2d 857. That was an opening for the jury to find that if defendant assaulted prosecutor with intent to kill him, rather than to pay him off, it was "what usually happens in cases of this kind." What becomes of the presumption of innocence in such cases? Defendant was not charged with conducting a lottery but with the more serious offense of assault and battery with intent to kill.

At the close of the charge counsel for defendant said, "may I have an exception to your Honor's remarks as to what sometimes leads up to these things, which

your Honor spoke to the jury about, as far as numbers are concerned?" An exception was noted for defendant. In our opinion the exception should have been sustained.

The case throughout was tried as though defendant had been indicted for operating a lottery, although none of the four charges on which he had been indicted bore any relation to a lottery. Nevertheless, the court said to the jury, "the thought I want to leave with you" is "that this is the kind of thing that grows out of numbers games." It has been our experience that one playing the numbers is reluctant to inform or testify against a writer, a pickup man or a banker unless they fail or refuse to pay off on hits, and we are not disposed to say that the trial judge erred in saying to the jury that they had "a right to consider that the things that happened from there on [after Eisenhower was taken to be paid off] are the natural consequences of this particular kind of business." But it is one thing to say that an assault and battery is a "natural consequence of this . . . business" and quite another thing to say "that what happened . . . is what usually happens in cases of this kind." That could convey only one meaning to the jury and that was that in "cases of this kind" it was usual and customary to physically attack or intimidate a winner rather than pay him off. In other words, "in cases of this kind" the presumption of innocence goes by the board. In *Commonwealth v. Stewart*, supra, where the court in defining the charge of sodomy said (p. 425) it "is the unnatural relationship between a man and a woman, as in this case,'" appellant contended that the use of the words "as in this case" was the equivalent of giving binding instructions for the Commonwealth; and, while we did not agree with that contention, we said that we were of opinion that it was "highly prejudicial to the defendant."

Judgment reversed and a new trial awarded.